974 So.2d 408 (2007)
CITY OF TAMPA, a Florida Municipal Corporation, Petitioner,
v.
CITY NATIONAL BANK OF FLORIDA, a National Banking Corporation, Trustee, and Citivest Construction Corporation, a Florida for Profit Corporation, Respondents.
No. 2D06-1383.
District Court of Appeal of Florida, Second District.
May 23, 2007.
Rehearing Denied August 30, 2007.
*409 David L. Smith, City Attorney, and Jerry M. Gerwitz, Chief Assistant Attorney, City of Tampa, Tampa, for Petitioner.
Scott A. McLaren and Marie A. Borland of Hill, Ward & Henderson, P.A., Tampa, for Respondents City National Bank of. Florida, a National Banking Corporation, Trustee, and Citivest Construction Corporation, a Florida for Profit Corporation.
Robert L. Rocke, Jonathan B. Sbar and Jodi L. Corrigan of Rocke, McLean & Sbar, P.A., Tampa for Amiens Curiae National Trust for Historic Preservation; Florida Trust for Historic Preservation, Inc.; Tampa Preservation, Inc.; Historic Hyde Park Neighborhood Association, Inc.; East Ybor Historic and Civic Association, Inc.; Old Seminole Heights Neighborhood Association, Inc.; and Southeast Seminole Heights Civic Association, Inc.
James R. DeFurio of James R. DeFurio, P.A., Tampa for Amicus Curiae Bayshore Royal Condominium & Company, Inc.
Valerie A. Fernandez and Steven G. Gieseler of Pacific Legal Foundation, Coral Gables, for Amicus Curiae Pacific Legal Foundation.
PER CURIAM.
The City of Tampa has petitioned for certiorari relief from an order of the circuit court that effectively reverses the City's denial of a certificate of appropriateness (COA) for the respondents, City National Bank of Florida and Citivest Construction Corporation (hereinafter, Citivest), to build a multistory residential condominium tower on Bayshore Boulevard in Tampa. Bayshore Boulevard overlooks Tampa's Hillsborough Bay. Every day, hundreds of people enjoy its long, continuous sidewalk for walking, jogging, rollerblading, and bicycling. The homes on the inland side of the boulevard present a mix of stately older houses, low-rise apartments and condominiums, opulent new mansions, and high-rise condominiums. One section of Bayshore Boulevard, approximately three miles long, forms an outer edge of the Hyde Park Historic District.
The lots on which Citivest proposes to build are zoned to permit a high-rise multifamily structure, but they are located at the southern end of the Hyde Park Historic District, which consists predominantly of one- and two-story single-family homes and *410 a few small low-rise apartment complexes. When Citivest appeared before the Architectural Review Commission (ARC) and then the City Council, the discussion focused almost entirely on the height of the proposed structurea building twenty-four stories high, which would be located immediately adjacent to an eleven-story condominium built in the 1920s and a two-story apartment complex of similar vintage. Located across a side street from Citivest's corner lot is one of the oldest homes on Bayshore Boulevarda two-story single-family house.
This case raises complex questions of statutory construction and asks whether the underlying zoning laws and the authority of the ARC over Citivest's buildable lots in the Hyde Park Historic District can be reconciled. In its review of the City's action, the circuit court concluded that the City departed from the essential requirements of law when it applied the Hyde Park ARC guidelines to conflict with and alter the building envelope that was contemplated by the applicable zoning ordinance and at least preliminarily approved by the zoning administrator. The COA was denied on the basis that the proposed structure violated the historic district guidelines. This case now comes to us on second-tier certiorari, and we deny the City's petition.
It is important to define what, this case does not involve. This is not a takings case, nor does it involve a challenge to the zoning ordinances, the architectural review criteria, or the design guidelines. In fact, at this juncture, this court is powerless to comment upon or decide the validity of the ordinances involved. Nor is this court empowered to review the record to determine whether the City's decision was supported by competent, substantial evidence. See Miami-Dade County v. Omnipoint Holdings, Inc., 863 So.2d 195, 199 (Fla.2003). The district court of appeal is simply the next step up the ladder of reviewup from the ARC, to the City Council, and to the circuit court Although the City Council apparently reviewed the ARC decision de novo, the circuit court's jurisdiction was through certiorari, and this court now must view this case through the very narrow lens of second-tier certiorari. "As a case travels up the judicial ladder, review should consistently become narrower, not broader." Haines City Cmty. Dev. v. Heggs, 658 So.2d 523, 530 (Fla.1995).
"As a practical matter, the circuit court's final ruling in most first-tier cases is conclusive, for second-tier review is extraordinarily limited." Fla. Power & Light Co. v. City of Dania, 761 So.2d 1089, 1092 (Fla.2000). In a second-tier certiorari proceeding, the appellate court is limited to considering whether the circuit court afforded the parties due process and applied the correct law. Id. To apply the correct law means to observe the essential requirements of law. Heggs, 658 So.2d at 530. As recently explained by the supreme court in Allstate Insurance Co. v. Kaklamanos, 843 So.2d 885, 890 (Fla. 2003):
"[C]learly established law" can derive from a variety of legal sources, including recent controlling case law, rules of court, statutes, and constitutional law. Thus, in addition to case law dealing with the same issue of law, an interpretation or application of a statute, a procedural rule, or a constitutional provision may be the basis for granting certiorari review.
Furthermore, evaluation of an alleged departure from the essential requirements of law requires consideration not only of whether a legal error has occurred but also of whether the error is so serious as to constitute a "`violation of [a] clearly *411 established principle of law resulting in a miscarriage of justice.'" Ivey v. Allstate Ins. Co., 774 So.2d 679, 682 (Fla.2000) (quoting Heggs, 658 So.2d at 528). Thus, we are mindful that even though our scope of review is narrow, we are nevertheless charged with ascertaining whether the circuit court, by overlooking sources of established law or applying an incorrect analysis to those it considered, committed a serious error of fundamental dimensions. Our review convinces us that the circuit court's decision does not depart from the essential requirements of law.
The ARC, and subsequently the City, denied Citivest a COA for its proposed condominium project essentially on the basis that the structure was too tall for its historic-district location. As the circuit court found, the City departed from the essential requirements of law when it concluded that the Hyde Park Design Guidelines, as applied by the ARC, effectively "trump" the zoning administrator's review of the plans for compliance with the zoning dictates. The RM-75 zoning designation of the property determines the maximum height of the building. Section 27-77 (Table 4-2) of the City of Tampa's Zoning Code specifies that buildings in the RM-75 district are limited in height by a 4:1 ratio of height to setback from the lot line. In the simplest of terms, for each four feet of height, the setback must increase another foot, so the height is ultimately restricted by the size of the lot. The RM-75 zoning district for this site was created in 1987. Prior to that timeand well before the creation of the Hyde Park Historic Districtthe property carried a high-rise zoning designation under the City's comprehensive plan. Thus the City has never, through its zoning designations, suggested an intent to exclude a high-rise building from this site. When the current owner of the property purchased it in 1996, he did so on notice of both the zoning designation and the fact of the property's location within the Hyde Park Historic District. The converse is also true, however: when the Hyde Park Historic District was created, this property was placed into the district carrying its high-rise zoning designation.
Zoning is considered in chapter 27 of the Tampa City Code; subsumed within the zoning chapter are regulations governing the Architectural Review Commission. Zoning section 27-216, for instance, dictates that new construction in the Hyde Park Historic District cannot be undertaken before the ARC issues a COA. Section 27-216(l) requires the ARC to consider the effect of the construction on not only the building site but also on "the relationship between such work and other buildings, structures or objects on the landmark site or other property in the historic district." Obviously, in this case, the ARC, the City Council, neighbors, and other interested parties emphasized the size disparity between Citivest's proposed highrise building and the predominantly oneand two-story houses in the historic district. Butand this is significantthe relationship consideration is qualified in the next sentence of that section: "In evaluating the effect and the relationship, the ARC shall consider historical and architectural significance, architectural style, design, arrangement, texture, materials and color." Notably lacking is any mention of height or mass of the proposed structure relative to others in the neighborhood.
However, section 27-216(m) of the Code lists a number of additional considerations for new construction, and these were the focus of the ARC and City Council hearings.
When the applicant wishes to undertake new construction within a historic district or on a landmark site, the ARC shall consider the compatibility of the *412 new construction with the existing character of the district or the landmark, but the ARC shall not dictate the architectural style of the new construction. Compatible design shall mean architectural design and construction that will fit harmoniously into the district or the landmark site. New construction shall be compatible in scale, materials and quality of construction with adjacent buildings and structures that have been designated.
The ARC shall include the following points in its consideration of an application for new construction:
(1) Scale: height and width;
(2) Setback;
(3) Orientation and site coverage;
(4) Alignment, rhythm and spacing of buildings;
(5) Form and detail: Link between, old and new;
(6) Maintaining materials within the district or on the landmark site;
(7) Maintaining quality within the district or on the landmark site;
(8) Facade proportions and window patterns;
(9) Entrances and porch projections;
(10) Roof forms;
(11) Horizontal, vertical or nondirectional emphasis.
(Emphasis added.)
The City argued at all stages in these proceedings that these criteria, particularly "scale: height and width," sanction the ARC's rejection of Citivest's proposed construction on the basis of height. In coming to that conclusion, both the City and the ARC rejected the theory that the term "scale: height and width" referred to the height-width ratio of the facades of a new building as compared with neighboring buildings within the historic district, which is essentially an aesthetic consideration. Instead, the ARC's and the City's focus converged on height alone, not the design aspects of scale.
Citivest, on the other hand, consistently contended that section 27-77 governs the parameters of its project and circumscribes the ARC's power to reject the building as too tall. Section 27-77(a)(2)(g) provides:

Schedule of statements of purpose and intent. The following array presents for the several districts the statements of purpose and intent applicable to each district.
. . . .
g. RM-75 residential multiple-family. This district provides primarily for high density multiple-family residential development. Such high density residential structures shall be located in close proximity to regional shopping, employment and public transportation opportunities.
Section 27-77(c) additionally provides:

Schedule of area, height, bulk and placement regulations. Except as specifically provided in other sections of this chapter, regulations governing the minimum lot area and width, required front, side and rear yards, floor area ratio, height of structures, area of signs and related matters shall be as shown in the schedule of area, height, bulk and placement regulations.
(Emphasis added.) Thus section 27-77(c), particularly the accompanying Table 4-2 mentioned above, governs the permissible height of structures. In fact, the building height "shall be as shown in the schedule," unless conflicting regulations "specifically provide" otherwise. The design guidelines listed in section 27-216(m) are, on their face, not specific. That is because they are part of the larger context of aesthetic considerations appropriate for the historic district. Although they come" within the *413 City's zoning code, they are not specific zoning regulations.
Even if the design guidelines as set out in section 27-216(m) were specific regulations, they were never intended to conflict with or supersede the primary zoning designations. This is apparent from their original statutory enactment. The Hyde Park Historic District was created with reference to section 266.407, Florida Statutes (1995), later renumbered section 266.0057, titled "Powers of governing bodies in and of Hillsborough County; architectural review board." Section 27-213 of the City Code, titled "Architectural Review CommissionPowers and duties," refers to section 266.0057 and states:
The architectural review commission shall have the following responsibilities as authorized and empowered by the provisions of this chapter and by F.S. Ch. 266.0057, F.S.:
(1) Approval or disapproval of plans related to . . . new construction involving . . . historic districts. . . .
. . . .

(2) Specific authorities and powers. In addition to the powers and duties stated elsewhere, the ARC shall take action necessary and appropriate to accomplish the purposes of this division. These actions include:
a. Approval or disapproval on applications for certificates of appropriateness. . . .
The language of the enabling statute is a telling limitation on the powers of the ARC. Section 266.0057(2)(c)(1) authorizes the ARC to
[a]pprove or disapprove plans for buildings to be erected . . . within the historical district. . [T]he control of the erection . . . of new . . . buildings or structures . . . is hereby designated to be a public purpose; but no rule may be adopted which is in conflict with any zoning ordinance of the governing bodies applicable to such area.
(Emphasis added.) Although the statute was sunsetted in 1997 when it became superfluous after the City had adopted its historic preservation ordinance, the continued inclusion of specific reference to the statute in the Code establishes a control and limitation upon the powers of the ARC.
Furthermore, section 27-216(o) of the Code states as follows:
The zoning administrator shall be the sole administrator of this Code as it pertains to landmark and historic district boundaries, the requirements for permitted or permissible special uses, the schedule of area, height, bulk and placement regulations, the parking requirements and any other item not dealing specifically with the procedure and review criteria for obtaining a certificate of appropriateness.
(Emphasis added.) The grammatical structure of that section reinforces its plain meaning that the zoning administrator, not the ARC, has the final word on height and "any other item not dealing specifically with the procedure and review criteria for obtaining" a COA. Thus, heightan item with which the COA review criteria are not concernedis governed by the zoning administrator, not the ARC.
Our analysis of the applicable statutes, code sections, and case law convinces us that the circuit court correctly applied the law in this matter and did not overlook any other source that would assist in its review. This court has diligently combed every appendix, case, ordinance, and statute submitted on behalf of any partyand has searched many other resourcesin an attempt to ascertain whether the ARC possesses the authority or power to require *414 a reduction in height of the proposed building so that it will be "compatible" with the historic character of the neighborhood and the surrounding structures. Repeatedly, we have scoured the record and applicable law for the answer to this question: Can the ARC, based on the design criterion of "scale: height and width" alone, limit a proposed structure to any particular height? No such power granted by the appropriate sovereign has been identified.
The City could have solved this issue by rezoning this property or, alternatively, carving this land out of the historic district, or even defining an overlay district encompassing this property and others that would include height limitations. Section 27-458(a) of the City Code declares that "the purpose of an overlay district is to allow for the application of specific regulations to a distinct geographic area." And section 27-458(b) further declares: "The overlay district concept is discussed in the Comprehensive Plan as a method of preserving the character of an area. It will encourage development to occur that is compatible with the existing scale and pattern of surrounding properties." Section 27-523 defines a historic residential overlay district as follows:
A special overlay district which recognizes and protects historic patterns of development including but not limited to the following physical elements: setback, height, site orientations and massing of buildings and accessory structures, placement of sidewalks, parking areas and infrastructure. Its purpose is to conserve existing' neighborhood' patterns of development by retaining historic structures that contribute to that pattern, while assuring that new construction will be consistent with it.
Thus, the City Code explicitly contemplates the creation of historic overlay districts in which building height can be limited in spite of underlying zoning. An example is the Seminole Heights Residential Historic. Overlay District, which is separate and distinct from the, historic district. The specific intent of the overlay district "is to ensure that infill residential development and additions thereto are compatible in building, and structural orientation, height, lot dimensional requirements and other site spatial relationships to the precedent within the established neighborhood." § 27-464(b), Tampa City Code (emphasis added). Such extensive power was not granted to the Hyde Park Architectural Review Commission.
This is a true apples and oranges case. The historic guidelines do not envisage application to a lot zoned RM-75 for height and density as a vehicle to reduce the height of the building. They are design guidelines, not specific zoning regulations. Although this case does not present constitutional issues, this language from the Third District Court of Appeal is helpful: "Zoning as applied to the height of buildings is an exercise of the police power. The height limitation must be specific and must promote the health, welfare, safety, and morals of the public in order to be valid and withstand an attack upon it as an unwarranted exercise of that power." Town of Bay Harbor Islands v. Burk, 114 So.2d 225, 227 (Fla. 3d DCA 1959). A specific height restriction that could be generally applied to all properties in a historic district is permissible., See Mandel v. City of Santa Fe, 119 N.M. 685, 894 P.2d 1041 (1995).
Unfortunately, the City has not undertaken legislative action that would avoid this conflict. The circuit court made this observation in its order denying the City's motion for clarification: "The City of Tampa has created this quagmire of competing *415 and seemingly inconsistent building requirements." We fully concur with that opinion.
Having found no departure from the essential requirements of law in the circuit court's order denying the City's petition for certiorari, we deny this petition.
CASANUEVA and DAVIS, JJ., and THREADGILL, EDWARD F., Senior Judge, Concur.